UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____-CIV

**02-60226**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ACCESS RESOURCE SERVICES, | ) |
| INC., dba | ) |
| Aura Communications; | ) |
| Circle of Light; | ) |
| Mind and Spirit; and | ) |
| Psychic Readers Network, | ) |
|  | ) |
| PSYCHIC READERS NETWORK, | ) |
| INC., | ) |
|  | ) |
| STEVEN L. FEDER, | ) |
|  | ) |
| and | ) |
|  | ) |
| PETER STOLZ | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND OTHER EQUITABLE RELIEF**



# TABLE OF CONTENTS

I.   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  **STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.   Access Resources, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2.   Psychic Readers Network, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        3.   Steven L. Feder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        4.   Peter Stolz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        5.   Common Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   OVERVIEW OF DEFENDANTS' BUSINESS OPERATION . . . . . . . . . . . . . . 5

        1.   Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.   Defendants' 800 and 900 Number Messages . . . . . . . . . . . . . . . . . 5
        3.   Defendants' Reader Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            a.   Reader Recruitment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            b.   Readers' Compensation and Other Policies . . . . . . . . . . . . . . . . . 8
        4.   Consumers' Interactions with Readers . . . . . . . . . . . . . . . . . . . . . . 9
        5.   Billing and Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            a.   Initial Telephone Billings . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            b.   Subsequent Collection Efforts . . . . . . . . . . . . . . . . . . . . . . . 10

    C.   DEFENDANTS USE UNLAWFUL BUSINESS PRACTICES THROUGHOUT
       THEIR OPERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   Defendants Misrepresent that Consumers Will Receive Readings At No
           Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        2.   Defendants' Readers Misrepresent the Cost of a Call or the Cost of
           Remaining on the Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        3.   Defendants Misrepresent that Consumers Are Legally Obligated to Pay
           Erroneous Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        4.   Defendants Place Frequent Telemarketing Calls to Consumers Without
           Providing Consumers With an Effective Method to Stop the Calls . . . . 15
        5.   Defendants' Advertisements Fail to Disclose Cost Information and
           Contain Representations Inconsistent With Actual Cost . . . . . . . . . . . . 16

6.     Defendants Threaten Consumers Who Have Disputed Charges With
Adverse Credit Reporting Without Investigating or Resolving the
Consumers' Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.     CONSUMER INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A.     THIS COURT HAS AUTHORITY TO GRANT THE RELIEF REQUESTED
UNDER SECTION 13(b) OF THE FTC ACT . . . . . . . . . . . . . . . . . . . . . . . . 18

B.     ISSUANCE OF A TEMPORARY RESTRAINING ORDER IS NECESSARY
AND APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.     The Commission Has Demonstrated a Likelihood of Success on the
Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
a.     Defendants Engage in Deceptive Acts and Practices in Violation
of Section 5 of the FTC Act . . . . . . . . . . . . . . . . . . . . . . . . . . 19
i.     Defendants Misrepresent that Consumers Will Receive a
Reading at No Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
ii.    Defendants' Readers Misrepresent the Cost of Calling or
Remaining on the Line to Defendants' Service . . . . . . . . 20
iii.   Defendants Misrepresent that Consumers Are Obligated
to Pay Erroneous Charges . . . . . . . . . . . . . . . . . . . . . . . 21
iv.    Defendants' Misrepresentations Described in
Subsections i-iii, Above, Are Material . . . . . . . . . . . . . 22
b.     Defendants Engage in Unfair Telemarketing Practices in
Violation of Section 5 of the FTC Act . . . . . . . . . . . . . . . . . . . . 22
c.     Defendants' Advertising and Billing Practices Violate the
900-Number Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
i.     In Their Advertisements, Defendants Fail to Disclose the
Cost of a Call to Their Service and Use Representations
and Techniques That Are Inconsistent with the
Communication of Cost Disclosures . . . . . . . . . . . . . . . 24
ii.    Defendants Threaten Consumers Who Have Disputed a
Charge With Adverse Credit Reporting Without Having
Investigated or Resolved the Dispute . . . . . . . . . . . . . . . 25
d.     The Individual Defendants Should Be Held Liable and Are
Subject to Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . 25
2.     The Balance of Equities Mandates Immediate Injunctive Relief . . . . . . . 27

C.    IMMEDIATE INJUNCTIVE AND OTHER EQUITABLE RELIEF IS
NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF . . . . . . . . . . . . . 27

1.    An Equity Receiver Will Maintain the *Status Quo* and Preserve Assets   28
2.    An Injunction and Freeze of the Defendants' Assets Are Necessary to
Preserve the Possibility of Effective Consumer Redress  . . . . . . . . . . . . 29

IV.   **CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

Cliffdale Associates, Inc.,
    103 F.T.C. 110 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FSLIC v. Sahni,
    868 F.2d 1096 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

FTC v. Amy Travel Service,
    875 F.2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25, 26

FTC v. Atlantex Assoc.,
    1987-2 Trade Cas. (CCH) ¶ 67,788 (S.D. Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . 19, 26

FTC v. Gem Merchandising Corp.,
    87 F.3d 466 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

FTC v. H. N. Singer, Inc.,
    668 F.2d 1107 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FTC v. Jordan Ashley, Inc.,
    1994-1 Trade Cas. (CCH) ¶ 70,570 (S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . 19, 26

FTC v. Publishing Clearing House, Inc.,
    104 F.3d 1168 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

FTC v. Sage Seminars,
    1995-2 Trade Cas. (CCH) ¶ 71,256 (N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 29

FTC v. Thompson Medical Co. Inc.,
    104 F.T.C. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FTC v. U.S. Oil & Gas Corp.,
    748 F.2d 1431 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 28

FTC v. University Health, Inc.,
    938 F.2d 1206 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

FTC v. Windward Marketing, Ltd.,
    1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept. 30, 1997) . . . . . . . . . . . . . . . . . . . . 22, 26

FTC v. World Travel Vacation Brokers, Inc.,
        861 F.2d 1020 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

FTC v. World Wide Factors, Ltd.,
        882 F.2d 344 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

Goodman v. FTC,
        244 F.2d 584 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Kraft, Inc.,
        114 F.T.C. 40 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,
        51 F.3d. 982 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

National Soc'y of Professional Eng'rs v. U.S.,
        435 U.S. 679 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Newman v. State of Alabama,
        466 F.Supp. 628 (M.D. Ala. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Orkin Exterminating Company, Inc. v. FTC,
        849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Southwest Sunsites, Inc.,
        106 F.T.C. 39 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

Standard Distributors v. FTC,
        211 F.2d 7 (2nd Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Standard Educators, Inc. v. FTC,
        475 F.2d 401 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. City of Detroit,
        476 F.Supp. 512 (E.D. Mich. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**DOCKETED CASES**

FTC v. Allstate Business Consultants Group, Inc.,
        No. 95-6634-CIV-Ryskamp (S.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FTC v. Automated Transaction Corp.,
        No. 00-7599-CIV-Hurley (S.D. Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FTC v. Cherico,
　　No. 96-1754-CIV-Moore (S.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FTC v. Megaking, Inc.,
　　No. 00-513-CIV-Lenard (S.D. Fla 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FTC v. National Scholarship Foundation, Inc.,
　　No. 97-8836-CIV-Ferguson (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FTC v. Urso,
　　No. 97-2680-CIV-Ungaro-Benages (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . 1

## STATE CASES

Parker v. Domino's Pizza, Inc.,
　　629 So.2d 1026 (Fla. 4th DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## FEDERAL STATUTES AND RULES

FTC Act, 15 U.S.C. § 45(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

FTC Act, 15 U.S.C. § 45(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FTC Act, 15 U.S.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Telephone Disclosure and Dispute Resolution Act of 1992, 15 U.S.C. § 5701 *et seq.* . . . . . 23, 24

900-Number Rule, 16 C.F.R. Part 308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23, 24, 25

## I.    INTRODUCTION

Plaintiff, Federal Trade Commission ("FTC" or "Commission"), brings this action to halt and redress Defendants' rampant use of deceptive, unfair, and illegal practices to market and collect for "psychic reader" audiotext services.[1]  Pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the FTC seeks a temporary restraining order ("TRO"), including appointment of an equity receiver and an asset freeze,[2] to halt Defendants' unlawful practices and to preserve their assets to ensure redress to injured consumers.[3]

Defendants operate a massive organization designed to convince consumers to access and pay for "psychic readings" provided over 900 number telephone lines.  Defendants initially lure consumers through their ubiquitous television advertisements, often featuring a "psychic" called "Miss Cleo."  Through these advertisements, which promise consumers "free readings," Defendants deceive consumers about the cost of their services.

The deception continues once consumers make a telephone call and are connected to a "psychic reader."  Defendants use a nationwide network of agents (hereinafter "readers") to provide "psychic readings" to consumers who call in response to Defendants' advertisements.

---

[1] "Audiotext services" and "pay-per-call services" are industry terms of art used to describe information and entertainment services provided over the telephone.  Consumers typically access audiotext services by dialing a telephone number beginning with a "900" prefix and are often billed on a per-minute basis for the service, with charges appearing on their local telephone bill.  Defendants use this billing system and typically charge consumers $4.99 per minute for their services.

[2] In support of its motion, the Commission has filed a certification of counsel and several volumes of evidence which establish Defendants' pervasive unlawful conduct, including numerous consumer declarations, transcripts of telephone calls and advertising, and statements of former readers, among other documents.  The number preceding the decimal point in the Commission's exhibit numbers identifies the volume in which the exhibit can be found.

[3] Courts in this jurisdiction have ordered, *ex parte*, the freezing of assets, the appointment of receivers, and other ancillary relief in circumstances similar to those found here.  See, e.g., Exs. 5.15-5.20: FTC v. Automated Transaction Corp., No. 00-7599-CIV-Hurley (S.D. Fla. 2000); FTC v. Megaking, Inc., No. 00-513-CIV-Lenard (S.D. Fla 2000); FTC v. National Scholarship Foundation, Inc., No. 97-8836-CIV-Ferguson (S.D. Fla. 1997); FTC v. Urso, No. 97-2680-CIV-Ungaro-Benages (S.D. Fla. 1997); FTC v. Cherico, No. 96-1754-CIV-Moore (S.D. Fla. 1996); FTC v. Allstate Business Consultants Group, Inc., No. 95-6634-CIV-Ryskamp (S.D. Fla. 1995).

1

Defendants' readers often lie to consumers about the cost of the call to convince them to stay on the line, and thus incur higher charges.

Defendants' deceptive practices continue well after the initial "reading" call has been completed. During the next phase of their scheme, Defendants use personal information acquired during the initial call to deluge consumers with unwelcome and misleading telephone and direct mail solicitations. Defendants repeatedly call consumers, sometimes up to ten times a day, disrupting their daily activities. Defendants' telemarketing conduct is particularly egregious because they do not give consumers an effective method to make the calls stop, often ignoring consumers' pleas to cease calling.

Several weeks after consumers call for a "free reading," they receive a telephone bill with substantial charges, sometimes up to $300 for a single call to Defendants' line. Many consumers dispute these charges, and succeed in convincing their telephone company to remove them. The consumer's struggle is not over, however, because they find themselves inundated with Defendants' harassing collection demands. Consumers who attempt to dispute Defendants' fraudulent or erroneous charges are flatly rebuked by Defendants' representatives, who tell them to pay the disputed charge or suffer credit ruination and legal action. Defendants' representatives make these threats without conducting any reasonable investigation of the consumer's dispute.

Defendants also bill and threaten many consumers who never accessed Defendants' services, including consumers who disconnected the telephone line purportedly used to access the services long before the date of the purported access. Some consumers simply give up and pay charges that they do not owe to avoid the dire consequences described in Defendants' threats.

Defendants' practices violate both Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive or unfair acts or practices in or affecting commerce, as well as the FTC's 900-Number Rule ("900-Number Rule" or "the Rule"), 16 C.F.R. Part 308 (Ex. 5.14), which governs advertisements for pay-per-call services and the resolution of billing disputes involving such services. Through these unlawful practices, Defendants have injured thousands of consumers. To address these practices, numerous states have brought actions against the

2

Defendants, and several have entered settlement agreements with the Defendants.[4] In spite of these state efforts, the Defendants' unlawful practices and resulting consumer injury continue.

In order to protect consumers immediately and to preserve the possibility of effective final relief, the Commission asks this Court to: (1) prohibit Defendants from using illegal practices in selling their services; (2) freeze Defendants' assets; (3) appoint a receiver; (4) require Defendants to provide an accounting; (5) provide the Commission with access to Defendants' business premises to review records; and (6) provide related equitable relief. Such an order is necessary to stop Defendants' willful misconduct and prevent the dissipation of assets and the destruction of records, thereby preserving the Court's ability to provide effective relief to the thousands of consumers victimized by Defendants' fraudulent scheme.

## II.   STATEMENT OF FACTS

In this section of its memorandum, the Commission will: (1) identify the Defendants of this action; (2) describe their business operation; (3) describe their unlawful business practices; and (4) set out the consumer injury caused by those unlawful practices.

### A. DEFENDANTS

#### 1. Access Resource Services, Inc.

Access Resource Services, Inc. ("ARS") is a Delaware corporation with its office and principal place of business at 2455 E. Sunrise Blvd., 10th Floor, Fort Lauderdale, Florida 33304. (Ex. 4.3, p. 5.) While Defendants use a variety of names in advertisements, their 800 and 900 number preamble messages identify either ARS or one of its fictitious names as the provider of the audiotext services at issue. (Exs. 3.5, pp. 4 & 6; 3.6, p. 8.) Moreover, Defendants typically send their collection letters in ARS's name. (See, e.g., Exs. 1.2, p. 10; 1.25, p. 4; 1.34, p. 5.) ARS transacts or has transacted business in the Southern District of Florida and throughout the United States.

---

[4] The states that have sued one or all of the Defendants are Arkansas, Illinois, Missouri, New York, North Carolina, Oklahoma, Pennsylvania, and Wisconsin. (Exs. 4.1, pp. 7-11, ¶¶ 21-35; 4.18-4.27.) Arkansas, Missouri, and North Carolina have entered settlement agreements with the Defendants. The state of Florida has obtained three assurances of voluntary compliance from Defendants regarding their practices. (Ex. 4.17.)

### 2. Psychic Readers Network, Inc.

Psychic Readers Network, Inc. ("PRN"), is a Florida corporation with the same address as ARS. (Ex. 4.5, p. 9.) Defendants use a postal permit registered to PRN to send millions of bulk mail solicitations a year for ARS's services. (Ex. 4.1, pp. 5-6, ¶ 17.) Websites devoted to recruiting "psychic readers" for Defendants' telephone lines refer to Defendants' organization as PRN, rather than ARS. (See, e.g., Exs. 2.3, pp. 2 & 36; 2.4, p. 3; 2.9, p. 4.) PRN transacts or has transacted business in the Southern District of Florida and throughout the United States.

### 3. Steven L. Feder

Defendant Steven L. Feder is a director of both ARS and PRN, and is PRN's President, Secretary, and Treasurer. (Exs. 4.3, p. 5; 4.5, p. 9.) He resides in Florida. (Ex. 4.1, p. 2, ¶ 8.) At last report, Feder holds 89% of PRN's stock. (Exs. 4.5, pp. 5-6; 5.13, p. 4.)

According to a former PRN reader's sworn testimony, Feder consults daily with the owners of the "bookstore" at which the reader worked.[5] (Ex. 3.7, pp. 15-16.) Feder also records "motivational" messages that readers hear when they log onto Defendants' network. (Exs. 2.13, pp. 58-62; 5.3, p. 5.) Such messages typically exhort readers to spend more time working the lines and to increase the average amount of time readers spend on the telephone with callers. Although not currently listed as ARS's President, Feder signed a 1999 Assurance of Voluntary Compliance ("AVC") with Florida referring to himself as President of ARS. (Ex. 4.17, p. 16.)

### 4. Peter Stolz

Defendant Peter Stolz owns the remaining 11% of the stock in, and is a director of, PRN. He is the President, Secretary, and Treasurer of ARS. (Exs. 4.3, p. 5; 4.5, p. 9.) He also resides in Florida. (Ex. 4.1, p. 2, ¶ 8.) As President of ARS, Stolz signed AVCs with the state of Florida in September 2000 and November 2001, and a consent judgment with the state of North Carolina in July 2001. (Exs. 4.17, pp. 5 & 11; 4.18, p. 30.)

### 5. Common Enterprise

The Defendants operate as a common enterprise and share a common business purpose: the sale of "psychic reader" audiotext services. They also share the same office space. (Exs. 4.3, p. 5; 4.5, p. 9.) Feder and Stolz are officers of more than a dozen active corporations, many of

---

[5] "Bookstore" is the Defendants' term for an organization responsible for recruiting readers.

4

which list the same address as ARS and PRN, and which may also have some role in Defendants' audiotext business. (Ex. 4.6.) ARS is the "fulcrum" of Defendants' enterprise, according to an ARS attorney. (Ex. 5.3, p. 3.)

## B. OVERVIEW OF DEFENDANTS' BUSINESS OPERATION

Defendants' business operation is large and complex. It involves a massive advertising campaign to persuade consumers to access their services, a system of recorded messages and live operators to direct consumers who call their lines, a nationwide network of readers who purportedly provide the "psychic readings" promised in Defendants' advertising, and an extensive organization to bill and collect for those services.

### 1. Advertising

Defendants use a variety of marketing methods to draw consumers to their "psychic" lines, including television, print media, the Internet, and direct mail (including email). Regardless of the format, Defendants' advertising generally features a toll-free telephone number for consumers to call to obtain a "free reading" or a "free tarot reading." (See, e.g., Exs. 1.40, pp. 25 & 44; 3.1; 3.2, p. 6; 4.10; 4.11, p. 4; 4.15.) The advertisements often include disclosures, in much smaller print, that the first three minutes of a call are free,[6] that the caller should be eighteen years old or older, and that the services are "for entertainment only." (Ex. 3.1.) Although consumers access Defendants' services through the use of 900 numbers, Defendants' advertisements generally fail to disclose this fact, and also fail to disclose the expensive charges associated with those 900 numbers.[7]

### 2. Defendants' 800 and 900 Number Messages

As described above, Defendants' advertisements typically feature toll-free numbers for consumers to call to obtain a "free reading." When consumers call these toll-free numbers, they are greeted by either an operator (see, e.g., Exs. 1.1, p. 1, ¶ 3; 1.40, p. 1, ¶ 2; 1.52, p. 1, ¶ 3) or a

---

[6] The amount of free time offered has varied, with three minutes appearing to be the most common. In many instances, the advertisements do not contain any disclosures regarding time limits associated with Defendants' offer of a free reading. (Exs. 1.40, pp. 25 & 44; 4.10, pp. 1-2; 4.11, p. 4; 4.15.)

[7] Defendants' television advertising, which typically includes the claims and disclosures described above, is described in more detail infra in Sections II(C)(1) & II(C)(5).

5

recorded message. (See, e.g., Exs. 1.7, p. 1, ¶ 2; 1.36, p. 1, ¶ 2; 1.46, p. 1, ¶ 3.) The operator or recording provides consumers with a 900 telephone number for consumers to use to receive their "free" reading and touts the quality of that reading. Callers who do not hang up after receiving the 900 number, but instead continue to listen to the entire message hear, at the end of the message and for the first time, a brief cost disclosure, suggesting that after the caller receives a free reading, he or she will be given the option of obtaining additional information or advice at a cost of $4.99 per minute. (Ex. 3.6, pp. 7-8.)

Consumers who call Defendants' 900 numbers hear a recorded preamble, often read by "Miss Cleo," before being transferred to readers. The preamble first hypes the Defendants' service, telling callers that they will receive the "best tarot reading of your life." The preamble goes on to state that the "first three minutes are free," the per-minute cost of additional "optional" minutes and that, to avoid charges, the caller should "disconnect within three seconds of hearing the tone after your free time."[8] (Ex. 3.5, p. 6.) The preamble neglects to inform consumers that the clock on the "free" three minutes begins running while they are listening to the recorded message and before they are connected to a reader and that the reading may not be completed or may not even start within the first three minutes of the call.[9] This is true even where consumers are specifically promised a "free three minute reading." (Ex. 3.5, p. 4.)

Callers are asked to state their first and last names, which Defendants record for use in billing disputes. (Ex. 3.5, p. 6.) Defendants then include a message before the caller is

_____

[8] Many consumers report they never heard a tone (see, e.g., Exs. 1.8, p. 1, ¶ 3; 1.11, p. 2, ¶ 5; 1.46, p. 1, ¶ 4), and in recordings of calls to the Defendants' lines, the tone is faint or nonexistent. (Exs. 3.5, p. 2, ¶¶ 7-8; 3.6, pp. 3-4, ¶¶ 7-11.) Indeed, the tone has been characterized by some of Defendants' own contractors as more like a "silent beep" or an interruption in sound than a clear tone. (Ex. 5.12, p. 9.) Adding to the consumers' difficulty in detecting this "silent beep" is the fact that it often occurs before the promised "free reading" has begun. (See, e.g., Exs. 1.36, p. 1, ¶¶ 3-5; 1.40, p. 1, ¶¶ 3-4; 3.9, pp. 4-5, ¶ 19.)

[9] Based upon the FTC's timing of recorded calls, the "free" minutes begin to elapse within approximately thirty seconds of the start of the recorded preamble, while the caller is still listening to that preamble. (Ex. 4.1, pp. 14-16, ¶¶ 43-47.) According to Defendants, in some instances, the amount of time that consumers spend listening to the recorded message and then waiting to be connected to the next available reader is so long that all but one minute of the "free" minutes have elapsed by the time the caller is connected to a reader. (Ex. 4.26, p. 7.)

6

transferred to a reader which advises callers to press "*9" if the reader places the caller on hold, states that the caller has won some prize, or that the entire call is free.[10] (Ex. 3.6, p. 15.) Defendants' automated system then briefly places the caller on hold while the system transfers the caller to a reader.

### 3. Defendants' Reader Network

While not apparent to consumers, Defendants' vast reader network is integral to Defendants' operation and substantially affects the audiotext services that consumers ultimately receive. Defendants receive so many calls that they reportedly have retained the services of more than 1,000 readers. (Ex. 3.9, p. 3, ¶ 12.) Several hundred readers may be actively staffing Defendants' lines at any given time. Defendants' system for recruiting readers, and policies affecting readers' handling of calls, are described below.

### a. Reader recruitment

Defendants contract with several bookstores to find readers for their lines. Bookstores recruit readers through newspaper and Internet advertising as well as other means. (See, e.g., Exs. 2.3, pp. 2-3; 2.4, p. 1; 2.6, p. 1.) These positions can be found among listings of work-at-home opportunities and similar offerings.[11]

Former readers report that it is easy to become a reader for Defendants and that being

---

[10] At some point, Defendants modified their warning message to refer to "*911" as the reporting mechanism. Defendants' "*911" system has not been effective in keeping unscrupulous readers off of Defendants' network, judging by the continued flow of consumer complaints that the readers misled them about the cost of the call. In fact, Defendants' readers are now incorporating the system into their deception by informing consumers that if they press "*911," consumers will be billed hundreds of dollars for a call that otherwise would be free. (See Ex. 1.7, p. 1, ¶ 3.) Based on the accounts of Defendants' contractors, it appears that this scam is common on Defendants' lines. (Ex. 5.12, pp. 16-17 & 34.) At least one bookstore used by Defendants has advised its readers to sidestep the "*911" system by quickly disconnecting a caller as soon as the caller begins dialing "*911." (Ex. 2.8, p. 37.)

[11] While some readers work at call centers, it appears that most readers work from home. Defendants' readers, to whom callers are encouraged to reveal the most confidential aspects of their lives, reportedly have included ex-felons and convicted criminals. (Ex. 4.29, pp. 26-27.) Some bookstores encourage their readers to save personal information obtained from consumers while doing readings on Defendants' network for use in multilevel marketing schemes or to sell to mailing list brokers. (Ex. 2.4, pp. 9 & 37.)

7

hired is mostly a matter of filling out the provided paperwork. (Exs. 3.8, p. 1, ¶ 3; 3.9, p. 1, ¶ 5.) Once a reader has completed the necessary paperwork, he or she is supplied with an extension number to use to log onto Defendants' computer network via the reader's telephone, which indicates that he or she is available to take calls. (See, e.g., Exs. 2.2, p. 2; 2.6, p. 6; 2.7, pp. 8-9.)

### b. Readers' Compensation and Other Policies

Defendants do not compensate readers directly, but instead pay the bookstores. Bookstores are responsible for paying readers and appear to have considerable latitude in setting readers' compensation. Out of the $300 hourly fee that Defendants charge for "psychic readings," readers generally earn somewhere between $7 and $12 for each hour of time spent with callers. (See, e.g., Exs. 2.2, p. 3; 2.3, p. 5; 2.4, p. 2.) Bookstores and brokers may recruit more readers than necessary to answer calls to Defendants' network. Accordingly, readers are essentially competing against one another for the opportunity to receive calls. Readers "win" this "competition" by keeping callers on the line for as long as possible.

Incoming calls to Defendants' network are distributed to readers based upon a priority ranking system. (See, e.g., Exs. 2.3, pp. 9-12 ; 2.4, pp. 40-42; 2.8, p. 15; 2.13, pp. 9-11.) Readers' rankings are based primarily on the average length of their calls. (Exs. 2.3, pp. 9-11; 2.13, pp. 10-11.) As calls come in, they are connected to the available reader with the highest priority ranking who is not currently handling a call. (Ex. 2.4, p. 40.) Readers achieve high rankings by keeping callers on the line for an average of twenty minutes or more. High-ranking readers can even receive calls back-to-back. (Ex. 2.3, p. 10.) However, readers who have lower call time averages are ranked lower and, as a result, are forced to wait longer for their next call. In some cases, low-ranking readers earn a lower hourly wage. (Exs. 2.3, pp. 11-12; 2.11, p. 16.) In fact, Defendants encourage their readers to keep callers on the line for at least 12-15 minutes. If readers' call times fall below this minimum, they risk being eliminated from Defendants' network altogether. (Exs. 2.8, p. 66; 2.9, p. 21.)

Readers use several tactics to draw out the length of their calls. For example, bookstores supply readers with lengthy, detailed scripts which simulate tarot card readings. (Exs. 2.3, pp. 13-31; 2.9, pp. 8-11; 2.13; p. 49, lines 5-13; 3.8, pp. 1-2, ¶ 5.) However, these scripts and guidelines are not always enough to achieve the desired call lengths. According to two former readers who worked for the same Florida call center, the pressure to maintain callers on the line

8

for lengthy periods of time was so great that readers often resorted to tactics that were against stated policy, but which were tacitly accepted by the call center's managers, including placing callers on hold. (Exs. 3.7, p. 6; 3.8, p. 4, ¶ 17.)

Because maintaining lengthy call averages is vital to readers' livelihood, readers keep close track of how much time they spend with callers. (Exs. 2.3, p. 12; 2.7, p. 13; 2.9, pp. 20-21.) While readers thus know how long they have been on the line, they are forbidden from disclosing this information to consumers even when explicitly asked to do so. Although readers are provided with "whisper messages" identifying the maximum length of the call, and hear a tone signifying that the call is near the maximum length (usually sixty minutes), the tone signifying the end of free time (usually three minutes) is not audible to readers.[12] (Ex. 3.9, p. 5, ¶¶ 20-21.) Defendants' policy prohibits readers from providing information to consumers about how many minutes have elapsed, how many minutes are free, or otherwise assisting callers with keeping track of time. (Exs. 2.8, p. 17, ¶ 7; 2.10, p. 14.)

### 4. Consumers' Interactions with Readers

After hearing the recorded preamble, a caller is transferred to one of Defendants' hundreds of "psychic readers" taking calls around the country. The reader proceeds to expend most, if not all, of the caller's "free" minutes gathering the caller's name, address, email address, and birth date for Defendants' future marketing efforts.[13] (Exs. 3.5, p. 2, ¶ 8; 3.6, pp. 38-40; 5.11, pp. 4-5.) During this initial portion of the call, the reader also provides the caller with another 900 number to use for future calls to Defendants' service.[14] (Exs. 2.2, p. 5; 2.4, p. 18;

---

[12] Although Defendants' readers do not hear the tone indicating the end of the free time, they nevertheless often lie to consumers about whether that tone has occurred. (See, e.g., Ex. 1.11, p. 2, ¶ 5; 3.6, p. 45, lines 1-4.)

[13] These efforts include a barrage of telemarketing calls, as described more fully in Section II(C)(4), and direct mail solicitations, including email. These solicitations promise additional "free readings." In many instances, readers are paid a 25 cent bonus for each name and address they gather that is not already in Defendants' marketing database. (Exs. 2.2, p. 3; 2.11, p. 16; 2.13, p. 22, lines 14-15.)

[14] In doing so, Defendants' readers fail to provide cost disclosures required by the 900-Number Rule.

2.8, p. 17.) The reader then makes introductory remarks or asks questions about the information the caller seeks before finally beginning the actual reading. As a result, by the time the reader gets to this portion of the call, the caller's "free" minutes usually have expired, and thereafter the caller is billed almost five dollars for every minute of the "free" reading.

### 5. Billing And Collection

#### a. Initial Telephone Billings

Some weeks after consumers' initial contacts with Defendants, Defendants place charges for their pay-per-call services on consumers' telephone bills. Defendants use Automatic Number Identification ("ANI") to capture consumers' telephone numbers when they call for their "free reading."[15] That information, as well as information concerning the date, time, and length of the call, is conveyed to Defendants' billing agent, in this case AT&T. AT&T submits an electronic record of the call and related charge to the line subscriber's local exchange carrier ("LEC"). The LEC then places the charge on the line subscriber's regular monthly telephone bill. When the LEC receives payment for the charge, the LEC transfers payment to AT&T. AT&T, in turn, transfers payment to Defendants.

In many instances, consumers dispute the validity of Defendants' 900 number charges with their LEC or AT&T and receive credit for those calls on their telephone bills. (See, e.g., Exs. 1.11, p. 2, ¶ 6; 1.15, p. 1, ¶ 2; 1.33, p. 1, ¶ 3.) In some jurisdictions, the percentage of consumers who receive credits for Defendants' 900 number charges on their telephone bills exceeds 70% of those billed, according to one of Defendants' bookstores. (Ex. 2.8, p. 52.)

#### b. Subsequent Collection Efforts

While many consumers believe the erroneous charges have been resolved once they

---

[15] ANI is a system that electronically captures the telephone number from which a call has been placed, similar to "caller ID." When Defendants receive a call, the telephone number of the line from which the call originated is captured, and a record of the call is created. However, there are limitations to the accuracy and completeness of ANI information. In cases of "clip on" fraud, which is a form of telephone service theft, or crossed wires, the use of ANI can result in consumers being billed for 900 number calls that were not placed from their telephones and for which they therefore do not owe. Furthermore, ANI only reveals the telephone number from which the call was placed and does not reveal the identity of the line subscriber responsible for that telephone number.

receive credits from their LECs or AT&T, in fact, these credits do not end the matter, because Defendants pursue collection of these charges directly.  Defendants use several tactics to accomplish their collection efforts, including multiple letters and telephone calls threatening to report consumers' failure to pay to credit reporting agencies. (See, e.g., Exs. 1.1, p. 7; 1.11, p. 13; 1.27, p. 9; 1.33, p. 2, ¶ 5; 1.40, p. 3, ¶ 10; 1.45, p. 2, ¶ 7.)  In some instances, Defendants indicate that legal action and seizure of assets may be imminent.[16]  (Exs. 1.2, p. 11; 1.15, p. 1, ¶ 4; 1.20, p. 3, ¶ 11.)

Defendants' collection letters include a telephone number consumers can call if they have questions.  However, consumers who call this number often are met with a busy signal, or a recording asking the caller to leave a message.  (Exs. 1.20, p. 3, ¶ 11; 1.21, p. 1, ¶ 4; 1.26, pp. 1-2, ¶ 6.)   Defendants, however, seldom respond to any such messages. (Exs. 1.25, p. 1, ¶ 3; 1.34, p. 1, ¶ 5; 1.39, pp. 1-2, ¶ 5.)  Consumers who actually get through speak to Defendants' customer service representatives, who inform consumers that they are obligated to pay the charges regardless of the reasons for the disputes.[17]  Many consumers report that the representatives are exceedingly rude and threatening, in some cases using abusive and vulgar language.[18]  In many instances, Defendants' representatives simply hang up on consumers who attempt to dispute

---

[16]  These threats may be yet another form of deception used by Defendants to extort payment from consumers.  There is no evidence that Defendants actually sue or report consumers for nonpayment, despite their threats to the contrary.

[17] The fact that this practice has been reported by numerous consumers indicates that it is a tactic commonly used by Defendants' customer service representatives. (See Exs. 1.2, pp. 1-2, ¶ 6; 1.8, p. 2, ¶ 8; 1.13, p. 2, ¶ 6-8; 1.14, p. 1, ¶¶ 3, 6-7; 1.15, p. 1, ¶ 4; 1.19, p. 1, ¶ 3; 1.20, p. 3, ¶ 11; 1.24, p. 2, ¶ 10-11; 1.27, p. 3, ¶ 11; 1.30, p. 3, ¶ 12; 1.33, pp. 1-2, ¶¶ 4-5; 1.35, p. 1, ¶ 4; 1.40, p. 3, ¶ 10; 1.41, p. 1, ¶¶ 5-6; 1.42, p. 2, ¶ 6; 1.43, pp. 1-2, ¶ 5; 1.44, p. 1, ¶ 3; 1.45, p. 2, ¶ 7; 1.46, pp. 1-2, ¶ 6; 1.48, pp. 1-2, ¶ 5; 1.51, p. 1, ¶ 5; 1.52, p. 2, ¶ 6.)

[18] Again, this practice is common.  (See Exs. 1.2, pp. 1-2, ¶ 6; 1.6, p. 2, ¶¶ 11-13; 1.9, p. 1, ¶ 8; 1.12, p. 2, ¶ 5; 1.13, p. 2, ¶¶ 6-8; 1.19, p. 1, ¶ 3; 1.20, p. 3, ¶ 11; 1.22, p. 2, ¶ 7; 1.24, p. 2, ¶¶ 10-11; 1.28, p. 1, ¶ 7; 1.35, p. 1, ¶ 4; 1.41, p. 1, ¶ 5; 1.42, p. 2, ¶ 6; 1.44, p. 1, ¶ 3; 1.45, p. 2, ¶ 7; 1.50, p. 2, ¶ 9; 1.51, p. 1, ¶ 5.)

11

charges.[19]

Defendants' representatives make no effort to listen to, much less conduct reasonable investigations of, consumers' disputes. Defendants do not provide consumers with any kind of written explanation as to any research they have done concerning consumers' billing disputes. Instead, Defendants simply repeat their claims that consumers are obligated to pay the charges.

Defendants' refusal to investigate consumers' billing disputes is particularly outrageous because their collection demands are frequently misdirected. When the LECs and AT&T issue credits to consumers who dispute ARS charges, Defendants apparently do not seek or obtain the names of the line subscriber who received the credit. In their efforts to pursue payment, Defendants rely upon commercially available directory services to find consumers linked to particular telephone numbers. Defendants send bills and collection demands to those consumers on the assumption that their telephones were used to make the credited audiotext calls.

Defendants' assumption is frequently wrong, because the directories they use are often inaccurate. Thus, many consumers report that Defendants demand payment for 900 number charges even though the consumers had disconnected the telephone numbers at issue long before the purported 900 number calls were made.[20] (Exs. 1.12; 1.14; 1.19; 1.25; 1.34; 1.38; 1.39; 1.42; 1.51.) When consumers attempt to explain that the telephone numbers identified in Defendants' collection letters were not their numbers at the time of the call, Defendants often respond with even more threatening collection letters. (Exs. 1.25, pp. 8-12; 1.34, pp. 5-6; 1.38 p. 11; 1.39, p. 8; 1.42, p. 6; 1.51, p. 5.)

## C. DEFENDANTS USE UNLAWFUL BUSINESS PRACTICES THROUGHOUT THEIR OPERATION

Throughout their operation, Defendants use unlawful practices to defraud consumers. The six unlawful practices which form the basis of the Commission's Complaint against the

---

[19] Likewise, this practice is routine. (See Exs. 1.13, p. 2, ¶ 6; 1.15, p. 1, ¶ 4; 1.19, p. 1, ¶ 3; 1.21, p. 1, ¶ 4; 1.27, p. 3, ¶ 11; 1.28, p. 1, ¶ 7; 1.30, p. 3, ¶ 12; 1.33, pp. 1-2, ¶ 4; 1.44, p. 1, ¶ 3; 1.48, pp. 1-2, ¶ 5; 1.50, p. 2, ¶ 9.)

[20] These consumers never received a telephone bill for the charges in question and had no dealings with Defendants until they received payment demands in the mail.

12

Defendants are outlined below.

### 1. Defendants Misrepresent that Consumers Will Receive Readings At No Cost

Defendants' advertisements promise that they will provide consumers with a "free reading" or a "free tarot reading." (Exs. 1.40, pp. 25 & 44; 3.1; 3.2, p. 6; 4.10; 4.11, p. 4; 4.15.) Defendants' television advertisements often feature "Miss Cleo," touted as a renowned "psychic reader," who quickly performs readings for, and gives advice to, persons who are supposedly callers to Defendants' telephone lines or members of a studio audience. (Exs. 3.2-3.4.) The advertisements prominently display a toll-free number for consumers to access the service. In much smaller print at the bottom of the screen appears a statement that the first few minutes of a call, usually three, are free. (Ex. 3.1.)

Consumers who call Defendants' displayed toll-free number are told that they must dial a 900 number to obtain the free reading. (See, e.g., Exs. 1.1, p. 1, ¶ 3; 1.13, p. 1, ¶ 2; 1.36, p. 1, ¶ 2; 1.40, p. 1, ¶ 2.) Consumers who dial that number find out, too late, that it is virtually impossible to obtain the promised reading without incurring charges. While Defendants' advertising demonstrations depict callers receiving complete readings in a few minutes' time (Ex. 4.1, pp. 12-14, ¶¶ 38-42), the first few minutes of an actual call to Defendants' 900 numbers are consumed with recorded preambles and the process of requesting and verifying the caller's contact information. (See, e.g., Exs. 1.13, p. 1, ¶ 3; 1.36, p. 1, ¶ 3, 5; 1.40, p. 1, ¶ 3-4; 3.5, p. 2, ¶ 8; 3.6, pp. 38-40; 5.11, pp. 4-5.)

In fact, Defendants discourage readers from providing readings to callers within the first few free minutes. If readers fail to take at least 12-15 minutes on average to provide a reading, they will stop receiving a steady flow of calls and may be fired altogether. (Exs. 2.3, pp. 11-12; 2.8, p. 66; 2.9, p. 21.) Consequently, consumers seldom receive readings within the free period of the call, but instead encounter readers who use lengthy scripts[21] and other delaying tactics to ensure that a reading is not completed, and often not even started, until the free period is over.

---

[21] Defendants' readers' use of scripts is prohibited by an AVC that ARS entered with the State of Florida. (Ex. 4.17, pp. 9-10.) Moreover, the scripts that Defendants' readers use are misappropriated from the copyrighted work of a California author, according to an infringement action recently filed against the Defendants. (Ex. 4.28.)

(See, e.g., Exs. 1.1, p. 1, ¶ 4; 1.36, p. 1, ¶ 6.)  When callers to Defendants' lines request that the reader provide the advertised "free reading" in the first three minutes of the call, Defendants' bookstores instruct readers to inform the callers that it is impossible to provide a "quality" reading in three minutes.  (Exs. 2.5, pp. 7 & 14; 2.6, p. 14; 2.7, 17; 2.8, p. 20.)  As a result, many consumers find that the "free reading" promised by the Defendants is actually quite expensive.

### 2. Defendants' Readers Misrepresent the Cost of a Call or the Cost of Remaining on the Line

Defendants' readers often lie to consumers to induce them to stay on the line longer than they otherwise would have.  The readers do this by giving consumers false information about the charges that they will incur by staying on the line.  These misrepresentations include:  1) telling callers that they will not be billed while they are on hold (Ex. 1.3, p. 1, ¶¶ 3-4); 2) telling callers who have been placed on hold or are otherwise waiting to speak to a reader that if the callers disconnect the call, they will be charged for time spent waiting on the line, and must remain on the line to be credited (Exs. 1.3, p. 1, ¶ 3; 1.7, p. 1, ¶ 3); 3) telling callers that their free minutes have not yet expired (Exs. 1.11, p. 2, ¶ 5; 1.27, p. 2, ¶ 9); and 4) telling callers that they are being awarded additional free minutes or that they will be reimbursed or credited for additional time spent on the line.  (Exs. 1.3, p. 1, ¶ 3; 1.6, p. 1, ¶ 3; 1.7, p. 1, ¶ 3; 1.11, p. 1, ¶ 4; 1.27, p. 2, ¶ 8; 1.40, pp. 1-2, ¶ 5.)  Consumers later discover that Defendants' representations were false when they receive a phone bill containing expensive charges for services that they were told would be free.

### 3. Defendants Misrepresent that Consumers Are Legally Obligated to Pay Erroneous Charges

Defendants often bill consumers for pay-per-call charges that they either did not incur or for which they are not otherwise legally obligated to pay.  Most egregious are the cases where Defendants bill consumers for calls made from lines that the consumers had disconnected months or years before the dates of the purported calls.  (Exs. 1.12; 1.14; 1.19; 1.25; 1.34; 1.38; 1.39; 1.42; 1.51.)  Defendants also bill consumers for calls that were not made from within the consumer's home (Exs. 1.9; 1.15; 1.21; 1.29; 1.30; 1.33; 1.37; 1.41; 1.47) or calls where consumers did not receive the promised service.  (Exs. 1.11; 1.13; 1.26; 1.46; 1.53.)

This practice is especially injurious to consumers because Defendants often do not correct

such bills when notified of the error by a consumer. (See, e.g., Exs. 1.15, p. 1, ¶ 4; 1.30, p. 3, ¶ 12; 1.33, p. 2, ¶ 5.) In fact, they repeat and intensify their misrepresentations that the consumers are obligated to pay the charges through a series of increasingly threatening collection letters and telephone calls. (See, e.g., Exs. 1.11, pp. 7 & 11; 1.13, p. 2, ¶ 8, & p. 5; 1.26, p. 9; 1.37, pp. 4-6.) Defendants' letters include threats of credit ruination and legal action, including seizure and garnishment of property. Some bear an attorney's signature. (Ex. 1.11, p. 13.) Many consumers have found that the only way to stop these threats and force the Defendants to correct their fraudulent bills is to complain to their state attorney general's office. (See, e.g., Exs. 1.9, pp. 1-2, ¶ 9; 1.15, p. 1, ¶ 5; 1.21, p. 2, ¶ 8; 1.30, p. 3, ¶ 14; 1.33, p. 3, ¶ 7.) Others simply give in to Defendants' threats and payment demands. (Exs. 1.6, p. 3, ¶ 20; 1.41, p. 1, ¶ 7; 1.46, p. 2, ¶ 8; 1.48, p. 2, ¶ 6.)

### 4. Defendants Place Frequent Telemarketing Calls to Consumers Without Providing Consumers With an Effective Method to Stop the Calls

After collecting consumers' telephone numbers using ANI, Defendants turn around and barrage consumers with telemarketing solicitations for their services. Many consumers receive two to three calls each day for many days (see, e.g., Exs. 1.10, p. 1, ¶ 3; 1.20, p. 1, ¶ 4; 1.26, p. 1, ¶ 2; 1.31, p. 1, ¶ 2), and some consumers receive ten or more calls in one day. (See, e.g., Exs. 1.4, p. 1, ¶ 2; 1.32, p. 1, ¶ 2.) Consumers receive calls from both live telemarketers and automated machines. Defendants' calls are so persistent and intrusive that they are, in and of themselves, the subject of numerous consumer complaints.

The aggravation of many consumers is compounded by the fact that they are unable to make the Defendants stop calling. Those who receive calls from Defendants' live telemarketers and ask them to remove their numbers from the calling list are often told that such removal is not possible. (Ex.1.31, p. 1, ¶ 3; 1.32, p. 1, ¶ 4.) Those who receive calls from Defendants' recordings are not given an effective and reasonable means to request such removal.[22] (See, e.g.,

---

[22] Defendants' lengthy recorded solicitation message repeats the toll-free number used to access their service several times. At the end of the message, Defendants sometimes include a toll telephone number to request removal from their call list. (Ex. 2.14, pp. 2-6.) Many consumers hang up after hearing the toll-free number, mistakenly believing that they can use it to

(continued...)

Exs. 1.10, p. 1, ¶ 3; 1.20, p. 1, ¶ 4; 1.22, p. 1, ¶ 5; 1.26, p. 1, ¶ 3.) Consumers who find a way to demand that Defendants stop their solicitation calls discover that their demands are ignored, as Defendants continue to call them. (Exs. 1.4, p. 1, ¶ 2; 1.10, pp. 1-2, ¶ 5-6; 1.22, p. 1, ¶ 5; 1.30, p. 1, ¶ 3; 1.40, p. 2, ¶ 7; 1.43, p. 2, ¶ 8; 1.45, p. 1, ¶ 2; 1.48, p. 1, ¶ 2.) The injury caused by Defendants' incessant barrage of telemarketing calls is described more fully in Section II(D).

### 5. Defendants' Advertisements Fail to Disclose Cost Information and Contain Representations Inconsistent With the Actual Cost

Defendants' advertisements do not provide consumers with any information about the cost of a call to one of their lines. (Exs. 1.40, pp. 25 & 44; 3.1; 3.2, p. 6; 4.10; 4.11, p. 4; 4.15.) Instead, Defendants' advertisements prominently display promises of a "free reading" or a "free tarot reading," and a toll-free number, leading consumers to believe the services can be obtained at no cost. In fact, consumers cannot access the advertised service via the displayed toll-free number, but rather must make a second call to a toll 900 number. Moreover, Defendants' claims that readings are free is inconsistent with the actual cost of obtaining a reading, which may be as much as $300. Furthermore, limitations concerning Defendants' offer of a "free reading" appear in small, difficult to read print (Exs. 3.1), or not at all. (Exs. 1.40, pp. 25 & 44; 4.10, pp. 1-2; 4.11, p. 4; 4.15.)

### 6. Defendants Threaten Consumers Who Have Disputed Charges With Adverse Credit Reporting Without Investigating or Resolving the Consumers' Disputes

Defendants regularly threaten to ruin the credit of consumers who have previously reported billing errors. Defendants' letters to such consumers include threats like: "This account will be reported as delinquent unless you make payment on this account. In short, you can prevent damage to your credit rating by satisfying your obligation." (See, e.g., Exs. 1.11, p. 9; 1.25, p. 8; 1.34, p. 5.) In telephone calls with consumers who have disputed charges, Defendants repeat these threats, yet they do so without conducting a reasonable investigation of the reported

---

[22](...continued)
make a do-not-call request. Dogged consumers who last until the end of the message and obtain the toll do-not-call number find that making a do-not-call request on that number not only costs them money, but also is no guarantee that the Defendants will abide by the request. (Ex. 1.20, p. 1, ¶ 4.)

error or transmitting a notification of any kind regarding the result of any investigation. (See, e.g., Exs. 1.23, p. 1, ¶ 6; 1.33, p. 2, ¶ 5; 1.42, p. 2, ¶ 6.) Consumers subject to these threats include both those who never used the Defendants' services and those who called but did not receive the promised service.

### D. CONSUMER INJURY

The extent of injury caused by the Defendants' fraudulent scheme is enormous. Defendants claim that more than six million consumers have called their lines (Ex. 4.16), many of whom were responding to Defendants' bogus offer of a "free reading." Once Defendants have lured consumers with their advertising, the consumers encounter Defendants' readers who often tell even more lies to convince consumers to stay on the line and generate additional charges. Thus, consumers end up receiving expensive telephone bills for services the Defendants claimed to provide at no cost. While many deceived consumers simply pay the charges that appear on their telephone bill without challenge, others expend considerable time and effort having the erroneous charges removed. (Exs. 1.12, p. 1, ¶ 3; 1.18, p. 1, ¶ 4; 1.29, p. 1, ¶ 5.)

Many consumers who never accessed or used Defendants' services find themselves wrongly subjected to Defendants' threats of credit ruination and legal action. Defendants' unwillingness to investigate consumers' assertions of billing errors, combined with the extreme nature of their collection threats, led many consumers to conclude they have no choice but to pay the fraudulent charges that Defendants have forced upon them. (Exs. 1.6, p. 3, ¶ 20; 1.41, p. 1, ¶ 7; 1.46, p. 2, ¶ 8; 1.48, p. 2, ¶ 6.)

To compound the injury caused by Defendants' misleading advertising and unlawful demands for payment, Defendants call consumers again and again, even after consumers have pleaded with the Defendants to stop calling. Those calls have caused injury by disrupting consumers' daily activities. (Exs. 1.4, p. 2, ¶ 6; 1.5, p. 2, ¶ 7; 1.21, p. 2, ¶ 7; 1.26, p. 1, ¶ 2; 1.32, p. 1, ¶ 3.) Many consumers have incurred expensive long distance and 900 number charges in attempts to make the Defendants stop calling (Exs. 1.26, p. 1, ¶¶ 4-5; 1.32, p. 1, ¶ 5; 1.45, pp. 1-2, ¶¶ 5-6), while others have taken more drastic and expensive measures to avoid the calls, such as changing telephone numbers (Ex. 1.45, p. 2, ¶ 8) or purchasing call screening devices. (Exs. 1.32, p. 2, ¶ 9; 1.40, p. 3, ¶ 12; 1.53, p. 3, ¶ 9.)

17

## III.   <u>ARGUMENT</u>

The FTC Act gives this Court the authority to grant the relief requested by the Commission. The Commission's evidence amply demonstrates that the requested relief is both appropriate and necessary to preserve the Court's ability to grant effective final relief.

### A. THIS COURT HAS AUTHORITY TO GRANT THE RELIEF REQUESTED UNDER SECTION 13(b) OF THE FTC ACT

"Section 13(b) of the [FTC Act] authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the Commission." FTC v. Gem Merchandising Corp., 87 F.3d 466, 468 (11th Cir. 1996). This "unqualified grant of statutory authority . . . carries with it the full range of equitable remedies . . . ." Id.; See also FTC v. Amy Travel Service, Inc., 875 F.2d 564, 571-572 (7th Cir. 1989), cert. denied, 493 U.S. 954 (1989).[23]

The Commission has requested that this Court enter an order that: (1) prohibits Defendants from using illegal practices in selling their services; (2) freezes Defendants' assets; (3) appoints a receiver; (4) requires Defendants to provide an accounting; (5) provides the Commission with access to Defendants' business premises to review records; and (6) provides other related equitable relief. The relief requested is authorized by Section 13(b) of the FTC Act and Fed. R. Civ. P. 65, and is necessary and appropriate in this case.

### B. ISSUANCE OF A TEMPORARY RESTRAINING ORDER IS NECESSARY AND APPROPRIATE

"[I]n determining whether to grant a preliminary injunction under Section 13(b), a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities." FTC v. University Health, Inc., 938 F.2d 1206, 1217 (11th Cir. 1991) (citation omitted); See also FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1026 (7th Cir. 1988); FTC v. World Wide Factors, 882 F.2d 344, 346 (9th Cir. 1989). Unlike private

---

[23] Specifically, it is the second proviso of Section 13(b), 15 U.S.C. § 53(b), that gives the Commission authority to bring a permanent injunction action in district court and the court authority to grant the full range of equitable relief. See FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1432-34 (11th Cir. 1984); FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1110-13 (9th Cir. 1982).

18

litigants, a governmental agency need not prove irreparable injury, which is presumed to exist in statutory enforcement actions. University Health, 938 F.2d at 1218 (citations omitted).

### 1. The Commission Has Demonstrated a Likelihood of Success on the Merits

The evidence submitted by the Commission amply meets the "likelihood of success on the merits" standard, demonstrating that the Defendants have engaged in a scheme to defraud consumers through violations of Section 5 of the FTC Act and the 900-Number Rule as outlined in the Commission's Complaint. The evidence demonstrates that: (a) the Defendants have engaged in deceptive acts and practices; (b) the Defendants have engaged in unfair acts and practices; (c) the Defendants have violated the 900 Number Rule; and (d) the individual Defendants are liable for the acts of the corporate Defendants and subject to injunctive relief.

### a. Defendants Engage in Deceptive Acts and Practices in Violation of Section 5 of the FTC Act

Defendants have violated Section 5 of the FTC Act which prohibits "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). An act or practice is deceptive in violation of Section 5 of the FTC Act if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. FTC v. Jordan Ashley, Inc., 1994-1 Trade Cas. (CCH) ¶ 70,570 (S.D. Fla. 1994), aff'd, 101 F.3d 707 (11th Cir. 1996) (Ex. 5.21); FTC v. Atlantex Assoc., 1987-2 Trade Cas. (CCH) ¶ 67,788 (S.D. Fla. 1987), aff'd 872 F.2d 966 (11th Cir. 1989) (Ex. 5.22). It is appropriate to infer that reasonable consumers interpret express claims to mean what they say. Atlantex Assoc., 1987-2 Trade Cas. at *11; Southwest Sunsites, Inc., 106 F.T.C. 39 (1985), aff'd, 785 F.2d 1431 (9th Cir. 1986).

### i. Defendants Misrepresent that Consumers Will Receive a Reading at No Cost

Defendants' advertising practices, as described in Section II(C)(1) above, constitute deceptive acts or practices in violation of Section 5. Defendants advertise "free readings," offered via toll-free numbers. Many of Defendants' advertisements depict the type of reading that a caller will receive: "Miss Cleo" providing a complete, succinct response to the caller's question or concern in three or four minutes.

Consumers who actually call Defendants are not provided with a reading at no cost. Instead, consumers find that they cannot access the advertised service via the toll-free number,

but must dial a 900 number.  Consumers who call the 900 number are unable to obtain a reading within the portion of the call that Defendants provide without charge.  Rather than receiving the kind of quick reading depicted in the advertisements, consumers find that the first few minutes of the call are consumed by recorded preambles and readers' requests for detailed personal contact information.  Callers also find that Defendants' readers drag out their readings to last as long as possible.  This practice is virtually mandated by the Defendants' call routing system, which ensures that readers who do not make their average reading last at least 12-15 minutes will stop receiving calls and eventually will be terminated from the network.  In fact, if "Miss Cleo" actually performed readings for callers to Defendants' lines in the manner portrayed on their television advertisements, she would likely be terminated for failing to maintain required call averages.  Thus, Defendants' representations that consumers will receive a reading at no cost are false.

Neither the fine print disclosures of the number of free minutes in the Defendants' advertisements, nor the cost and time disclosures in their toll-free and 900-number preamble messages correct the misrepresentation that callers will receive a reading at no cost.  See Kraft, Inc., 114 F.T.C. 40, 120 (1991), aff'd, 970 F.2d 311 (7th Cir. 1992), cert. denied, 507 U.S. 909 (1993) (Misleading claims of calcium content in cheese manufacturer's advertisement not corrected by brief appearance of superscript qualifying those claims).  Defendants' representation of a free reading remains misleading unless they provide that reading within the allotted free minutes.  Since they usually fail to do so, Defendants' advertisements are deceptive.

### ii.  Defendants' Readers Misrepresent the Cost of Calling or Remaining on the Line to Defendants' Service

Defendants' readers' representations to consumers during calls to Defendants' lines, as described in Section II(C)(2), also constitute deceptive acts or practices in violation of Section 5.  Defendants' readers often make misrepresentations to consumers about the cost of a call to Defendants' service or the cost of continuing to stay on the line.  While the exact representations readers use vary, they typically involve claims that consumers will not be billed for time spent on the 900 number call.  It is reasonable for consumers to rely on the representations of Defendants'

20

readers regarding the cost of a call.[24]   Regardless of readers' representations, callers are, in fact, billed for each minute they spend on the line past the first few free minutes.  Thus, the representations of Defendants' readers regarding the cost of the call or the cost of remaining on the line are false.

### iii. Defendants Misrepresent that Consumers Are Obligated to Pay Erroneous Charges

Defendants also violate Section 5 by representing that consumers are monetarily liable for audiotext services they did not purchase.  As described in Section II(C)(3) of this memorandum, Defendants send consumers who have never used their services bills claiming that those consumers are legally obligated to pay charges for pay-per-call services.  Those bills threaten consumers with dire consequences for non-payment of those charges, including credit ruination and legal action.  Defendants' representatives reiterate this assertion to consumers who call to dispute the charges.

Defendants' representations that consumers are legally obligated to pay for audiotext services that they did not access or receive is patently false.[25]  Defendants persist in these false

---

[24] Defendants label their readers "independent contractors" in an apparent attempt to insulate themselves from liability for acts like those described in the Commission's complaint, including readers' misrepresentations about the cost of the calls.  Liability under the FTC Act, however, does not depend on whether Defendants' representatives are employees or independent contractors.  Goodman v. FTC, 244 F.2d 584, 591-92 (9th Cir. 1957) (under the FTC Act, a person may be held liable for acts of his salespersons acting within scope of apparent or actual authority, regardless of the manner in which salespersons may be designated in contracts between them).  See also Parker v. Domino's Pizza, Inc., 629 So.2d 1026, 1027 (Fla. 4th DCA 1993) (under Florida law, a party may not absolve itself from liability for the acts taken on its behalf by a second party by simply calling that party an independent contractor).  Under the FTC Act, a principal is liable for misrepresentations made by his agents regardless of unsuccessful efforts of the principal to prevent such misrepresentations.  Standard Distributors v. FTC, 211 F.2d 7, 13 (2nd Cir. 1954).  A company cannot benefit from the acts of its agents without also incurring liabilities associated with its agents' conduct.  Goodman, 244 F.2d at 592.

[25] While this memorandum concentrates on consumers who are not obligated to pay Defendants' charges because they were billed for services they never accessed, consumers who were deceived into incurring telephone charges by Defendants' misleading promises of "free

(continued...)

21

statements even after consumers have notified them of the billing errors. Defendants also use threats of financial and legal consequences to induce consumers to act on those misrepresentations by paying the erroneous charges.

### *iv.* Defendants' Misrepresentations Described in Subsections *i-iii*, Above, Are Material

Misrepresentations are material if they are likely to affect a consumer's purchasing decision. <u>Cliffdale Associates, Inc.</u>, 103 F.T.C. 110, 165 (1984), <u>appeal</u> <u>dismissed</u> <u>sub</u> <u>nom.</u>, <u>Koven v. F.T.C.</u>, No. 84-5337 (11th Cir. 1984). Express and deliberately implied claims are presumed to be material. <u>Id.</u> at 168. Moreover, misrepresentations are material when they concern issues at the heart of a consumer's purchasing decision. <u>FTC v. Thompson Medical Co. Inc.</u>, 104 F.T.C. 648, 817 (1984), <u>aff'd</u>, 791 F.2d 189 (D.C. Cir. 1986), <u>cert. denied</u>, 479 U.S. 1086 (1987).

Defendants make the misrepresentations described in Subsections *i-iii* expressly. Thus, the misrepresentations are presumptively material. Moreover, Defendants' misrepresentations are material because they concern issues central to consumers -- the cost of Defendants' services and their obligation to pay for charges billed to them.

### b. Defendants Engage in Unfair Telemarketing Practices in Violation of Section 5 of the FTC Act

Defendants' telemarketing practice of repeatedly soliciting consumers with telemarketing calls without providing them with any reasonable method to stop the relentless calls, as described in Section II(C)(4), above, violates the prohibition against unfair acts or practices contained in Section 5 of the FTC Act. An act or practice is unfair under Section 5 of the FTC Act if: 1) it causes substantial injury to consumers; 2) the harm is not outweighed by any countervailing benefits; and 3) the harm is not reasonably avoidable. 15 U.S.C. § 45(n). <u>See</u> <u>also</u> <u>Orkin Exterminating Company, Inc. v. FTC</u>, 849 F.2d 1354, 1363-68, <u>reh'g</u> <u>denied</u>, 859 F.2d 928 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 1041 (1989); <u>FTC v. Windward Marketing, Ltd.</u>, 1997 U.S. Dist. LEXIS 17114 at *19-21 (N.D. Ga. Sept. 30, 1997) (Ex. 5.23).

---

[25](...continued)
readings" are likewise not obligated to pay those charges.

The consumer declarations submitted by the Commission leave no doubt that Defendants' telemarketing practices cause substantial injury to consumers, as described more fully in Section II(D), above. No credible benefit to consumers or to competition outweighs the harm caused by Defendants' practice of continually making telemarketing calls to consumers who have stated that they do not wish to receive such calls.[26] In fact, Defendants' practice has the effect of harming both consumers and competition by evoking consumer anger towards telemarketers generally.

Further, consumers have no reasonable way to avoid the calls. Many consumers have informed Defendants' telemarketers that they want the calls to stop. Defendants' telemarketers continue to call consumers who have requested that the calls stop. In short, there is no effective way a consumer can reasonably prevent Defendants' telemarketing calls. For these reasons, the Defendants' telemarketing practices are unfair in violation of Section 5.

### c. Defendants' Advertising and Billing Practices Violate the 900-Number Rule

The Commission's 900-Number Rule, 16 C.F.R. Part 308, became effective on November 1, 1993, implementing the requirements of the Telephone Disclosure and Dispute Resolution Act of 1992 ("TDDRA"), 15 U.S.C. § 5701 *et seq*. The 900-Number Rule establishes, *inter alia*, procedures for billing and collecting charges for pay-per-call services and requirements relating to making cost disclosures for those services.

In enacting TDDRA, Congress emphasized the importance of such regulations to the pay-per-call industry and consumers. Congress found that the "continued growth of the legitimate pay-per-call industry is dependent upon consumer confidence that unfair and deceptive behavior will be effectively curtailed and that consumers will have adequate rights of redress." 15 U.S.C. 5701(b)(7). It also addressed the importance of effective cost disclosures in advertisements: "Because the consumer most often incurs a financial obligation as soon as a pay-per-call

---

[26] The Commission does not contend that the practice of making frequent and repeated telemarketing calls to consumers is an unfair practice in and of itself. Rather, Defendants' frequent and repeated calls are unfair because they are coupled with either a failure to give consumers a reasonable means to make the calls stop, or a refusal to honor consumers' requests that the calls cease.

transaction is completed, the accuracy and descriptiveness of vendor advertisements become crucial in avoiding consumer abuse." 15 U.S.C. 5701(b)(6).

Defendants' advertising practices violate Section 308.3 of the 900-Number Rule and their billing and collection practices violate Section 308.7 of the Rule. Those violations are discussed more fully below.

### *i.* In Their Advertisements, Defendants Fail to Disclose the Cost of a Call to Their Service and Use Representations and Techniques That Are Inconsistent with the Communication of Cost Disclosures

Section 308.3(a)(5) of the 900-Number Rule prohibits the use of representations or techniques in any advertisements that are inconsistent with, in mitigation of, or that detract from communication of the cost disclosures required by the Rule. This provision of the Rule is intended to ensure that 900 number service providers do not use advertising methods that might adversely impact consumers' attentiveness to the required cost disclosures. Section 308.3(b)(1) requires a provider of pay-per-call services to disclose the cost of a call to the service clearly and conspicuously in any advertisement for that service.

Defendants' advertisements, as described in Section II(C)(5) above, violate Section 308.3. Defendants' failure to make <u>any</u> disclosure of the cost of a call to their "psychic" lines in the advertisements for those lines is a clear-cut violation of Section 308.3(b)(1) of the Rule.

Moreover, Defendants prominently use toll-free numbers and phrases like "free reading" and "free call" in their advertisements. At the same time, they display a disclaimer in much smaller and more difficult to read print that only the first few minutes of a call are free. Because these techniques are inconsistent with and mitigate required cost disclosures, they violate Section 308.3(a) of the Rule. Defendants' inconsistent and contrary representations have caused considerable confusion among consumers and have caused many consumers to be billed for services they believed were free.

24

### ii. Defendants Threaten Consumers Who Have Disputed a Charge With Adverse Credit Reporting Without Having Investigated or Resolved the Dispute

Section 308.7(i)(1) of the Rule addresses the responsibilities of a billing entity for pay-per-call services where a consumer has disputed a charge.  It states that once a customer has submitted a notice of a billing error, a billing entity:

> may not report or threaten directly or indirectly to report adverse information to any person because of the customer's withholding payment of the disputed amount or related charges, until the billing entity has met the requirements of § 308.7(d) and allowed the customer as many days thereafter to make payment as prescribed by § 308.7(d)(3)(ii).

Section 308.7(d) of the Rule requires a billing entity, in response to a consumer's assertion of a billing error, to either:  1) credit the customer for the disputed amount; or 2) transmit an explanation to the customer, after conducting a reasonable investigation, setting forth reasons why it has determined that no billing error occurred.  16 C.F.R §§ 308.7(d)(2)(i) and (ii).

Defendants' billing practices, as described in Section II(C)(6) above, violate § 308.7(i) of the 900-Number Rule. 16 C.F.R. 308.7(i).  The consumer declarations submitted by the Commission demonstrate that the Defendants regularly threaten to make adverse reports to credit agencies to consumers who have notified them of billing errors.  Those declarations also demonstrate that the Defendants make those threats without having taken the required steps to investigate and respond to the consumer's dispute as enumerated by the Rule.

### d. The Individual Defendants Should Be Held Liable and Are Subject to Injunctive Relief

Individual Defendants Steven Feder and Peter Stolz share responsibility for the deceptive, unfair, and unlawful practices of the corporate Defendants and are thus subject to preliminary and permanent injunctive relief.  Under the FTC Act, an individual may be held liable for injunctive relief for the acts of a corporate defendant if the individual participated directly in the unlawful activities or had the authority to control such activities.  See FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir. 1997), as amended, 1997 U.S. App. LEXIS 6698; Amy Travel, 875 F.2d at 573-74.  Similarly, an individual may be held liable for monetary redress under the Act for corporate practices if the individual directly participated in the

deceptive acts or had some control over the acts and actual or constructive knowledge of the deception.[27] Jordan Ashley, at ¶ 72,096 (citing Amy Travel, 875 F.2d at 573) (Ex. 5.21). However, "an individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." FTC v. Windward at 25 (citations omitted) (Ex. 5.23). Constructive knowledge, moreover, can be shown by demonstrating that defendants were recklessly indifferent to the truth, or had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. See Publishing Clearing House, 104 F.3d at 1170-71.

The two corporate Defendants are small, closely held corporations. As controlling officers or directors of both corporations, the individual Defendants have the requisite control, and presumptively the requisite knowledge about the bad actions of the corporations they control to be held directly liable for those actions. See also Standard Educators, Inc. v. FTC, 475 F.2d 401, 403 (D.C. Cir. 1973), cert. denied, 414 U.S. 828 (1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception.")

Steven Feder's control over the corporate Defendants is undisputable. Mr. Feder is a director of both of the corporations, reportedly owns 89% of PRN's stock, is listed in corporate records as the President, Secretary, and Treasurer of PRN, and has represented that he is the President of ARS in an AVC signed with the State of Florida. Sworn testimony of former readers shows that he directly participates in the day-to-day operations of the corporations through acts such as recording the daily informational messages that readers hear when they log on to Defendants' telephone network. Mr. Feder's knowledge of the unlawful acts and practices of the corporate Defendants is likewise beyond dispute. The evidence shows that he has knowledge of thousands of consumer complaints and numerous state government lawsuits and settlements regarding those very acts and practices.

---

[27] To satisfy Section 5's knowledge requirement, the Commission "need not demonstrate . . . that the individual defendants possessed the intent to defraud." Jordan Ashley, 1994-1 Trade Cas. at 72,096 (citing Amy Travel, 875 F.2d at 573-74). In addition, "direct participation in the fraudulent practices is not a requirement for liability. Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." Atlantex Assocs., 1987-2 Trade Cas. at 59,254 (citations omitted).

26

Peter Stolz's liability for the acts and practices of the corporate Defendants is also clear. He is a director of both corporations, President, Secretary, and Treasurer of ARS, and a signatory for ARS on both an AVC with the state of Florida and a consent judgment with the state of North Carolina. Mr. Stolz's knowledge of the voluminous consumer complaints and numerous state actions regarding the unlawful acts and practices of the corporate Defendants is amply demonstrated by his participation in the settlement of state enforcement actions.

**2. The Balance of Equities Mandates Immediate Injunctive Relief**

Once the Commission establishes the likelihood of its ultimate success on the merits, preliminary injunctive relief is warranted if the Court, weighing the equities, finds that relief is in the public interest. The evidence submitted in this proceeding demonstrates that the public equities -- protection of innocent consumers, effective enforcement of the law, and the preservation of Defendants' assets for consumer redress -- weigh heavily in favor of granting the injunctive relief requested in this case.

Defendants' conduct evidences a pattern of law violations central to the success of their enterprise. Given the pervasive nature of the fraudulent activity, there is a strong likelihood that, absent injunctive relief, future law violations will occur. Southwest Sunsites, 665 F.2d at 723 ("a large-scale systematic scheme tainted by fraudulent and deceptive practices gives rise to . . . a reasonable expectation of continued violations absent restraint.")

On the other hand, the private equities in this case are not compelling. Compliance with the law is hardly an unreasonable burden. See World Wide Factors, 882 F.2d at 347 ("there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation, or preserve their assets from dissipation or concealment.") Although an order may curtail Defendants' activities, "that is a necessary and . . . unavoidable consequence of the violation." National Soc'y of Professional Eng'rs v. U.S., 435 U.S. 679, 697 (1978).

**C.   IMMEDIATE INJUNCTIVE AND OTHER EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF**

As part of the permanent relief in this case, the Commission seeks restitution to consumers injured by Defendants' unfair and deceptive practices. To preserve the possibility of such relief, it is necessary to prevent the Defendants from dissipating assets or documents

27

pending the final disposition of this litigation. The Commission's years of experience in litigation with fraudulent operations indicates that there is a real danger that the Defendants will dissipate assets and destroy evidence absent the requested relief. (See Certification of Counsel, ¶¶ 17-26.) Accordingly, the Commission seeks an order appointing a temporary receiver for Corporate Defendants and freezing the Defendants' assets.

### 1. An Equity Receiver Will Maintain the *Status Quo* and Preserve Assets

The Commission seeks the appointment of a receiver for corporate Defendants. This Court has the inherent power to appoint a receiver "as an incident to its express statutory authority to issue a permanent injunction under Section 13 of the Federal Trade Commission Act." FTC v. U.S. Oil & Gas, 748 F.2d at 1432.

Appointing a receiver for the corporate Defendants is essential to prevent the destruction of evidence and the concealment or dissipation of assets. The corporate Defendants comprise a massive organization that is permeated with fraud. Defendants have shown no ability or inclination to abide by the law. Multiple state actions against the Defendants have left their deceptive practices fundamentally unchanged, as the flood of consumer complaints about those practices continues unabated. (Ex. 4.1, pp.6-7, ¶ 20.) In fact, the Defendants remain defiant in the face of attempts to halt their unlawful practices, as evidenced by comments made by an attorney for ARS in a recent news article, suggesting that the state actions to curtail Defendants' fraud merely resulted from complaints of deadbeat customers, grandstanding by state attorneys general, and religious and racial prejudice.[28] The need for immediate injunctive relief is further demonstrated by recent events arising from a private party's copyright infringement action against the Defendants. Defendants' readers were ordered to sign affidavits, supplied by the Defendants, denying the substance of the allegations of the copyright action. A reader who refused to sign the affidavit because she found it untruthful was told that she would be fired for her refusal. (Ex. 4.28, pp. 45-54.)

Courts have found the appointment of a receiver appropriate where, as here, such appointment would assist in ensuring the defendant's compliance with the court's orders. United

---

[28] Jim Gaines, *Call Me Now!. . . And Pay Me Later,* NEW TIMES BROWARD-PALM BEACH, January 3, 2002 (Ex. 4.29, pp. 2, 7, & 9).

States v. City of Detroit, 476 F.Supp. 512, 520 (E.D. Mich. 1979); Newman v. State of Alabama, 466 F.Supp. 628, 635 (M.D. Ala. 1979). To allow the Defendants to remain in control of this operation would be tantamount to allowing the proverbial fox to guard the henhouse.

In this case, a receiver will monitor the use of the corporate Defendants' assets and preserve records that will assist in identifying those assets, determining the size and the extent of the fraud, and identifying the persons injured. A receiver will also ensure that adequate notice of this proceeding is given to employees, agents, and others who promote or participate in Defendants' scheme, thus avoiding additional consumer injury. Without a corporate receiver in place, Defendants, through their complex web of corporations, bookstores, readers, and advertisers, will continue to injure consumers through their unlawful acts, conceal evidence of their wrongdoing, and dissipate whatever funds the corporate Defendants have in order to avoid paying redress to the consumers they have harmed.

### 2. An Injunction and Freeze of the Defendants' Assets Are Necessary to Preserve the Possibility of Effective Consumer Redress

The Commission also seeks an order freezing the assets of the Defendants. An asset freeze may be imposed where the *possibility* of dissipation of assets exists. FSLIC v. Sahni, 868 F.2d 1096, 1097 (9th Cir. 1989), FTC v. Sage Seminars, 1995-2 Trade Cas. (CCH) ¶ 71,256 (N.D. Cal. 1995)(Ex. 5.24.)[29] Indeed, the Eleventh Circuit has noted the importance of asset freezes in cases that seek equitable final remedies. "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d. 982, 987 (11th Cir. 1995).

An asset freeze is necessary here to preserve the possibility of restitution for victimized consumers. See Gem Merchandising, 87 F.3d at 469. Without an asset freeze, the strong

---

[29] In Sahni, the Ninth Circuit reversed a district court's denial of an asset freeze where the district court required a showing of a likelihood of dissipation. The court held that "[s]o long as the district court continued to believe that FSLIC was likely to succeed on the merits, the court should only have required FSLIC to show a possibility of dissipation of assets." Requiring a showing of a "likelihood" of dissipation "placed an unnecessarily heavy burden on FSLIC." Sahni, 868 F.2d at 1097.

29

possibility exists that the Defendants will attempt to shield assets to avoid paying restitution to injured consumers. The scope of the monetary liability for Defendants' unlawful conduct is enormous and provides considerable motivation for the Defendants to place their assets beyond the Court's reach. The injunctive relief requested by the Commission will help to preserve those assets for consumer redress.

## IV.   CONCLUSION

Defendants are engaged in an ongoing, deceptive scheme that victimizes consumers nationwide. Defendants will continue their scheme, causing further harm to the public, unless restrained by this Court. The Commission therefore respectfully moves this Court to issue the requested relief, which will preserve the *status quo* pending further hearing.

Respectfully submitted,

DATED: 02/12/02

WILLIAM E. KOVACIC
General Counsel

ELIZABETH M. GRANT
ROBERT G. SCHOSHINSKI
Attorneys
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
Telephone: (202) 326-3299; -3219
Facsimile: (202) 326-3395
E-Mail: egrant@ftc.gov; rschoshinski@ftc.gov